# United States Court of Appeals
## for the
## First Circuit

---

No. 24-1072

STERI-TECH, INC.
*Petitioner,*

v.

United States Environmental Protection Agency
Region II, Caribbean Environmental Protection Division
*Respondent*

*On Review from an Order of an Administrative Agency*

# BRIEF FOR THE PETITIONER

LIZABEL M. NEGRÓN-VARGAS, ESQ.
USCA-01 15106
PO Box 360764
San Juan, PR 00936-0764
Tel: 787-392-0450 Fax: 787-281-0708
lizanegron@yahoo.com

RAFAEL A. TORO-RAMÍREZ, ESQ.
USCA -01 27304
P.O. Box 11064
San Juan, P.R.  00922-1064
Tel 787.299-1100 Fax 787.793.1146
rtoro@toro-arsuaga.com

*Attorneys for Petitioner*

# CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rule of Appellate Procedure 26.1 and Local Rule

26.1 of the United States Court of Appeals for the First Circuit, Petitioner

Steri-Tech, Inc. ("Steri-Tech") respectfully submits the following disclosure:

1. Steri-Tech is a nongovernmental corporate entity, incorporated under the laws of the Commonwealth of Puerto Rico.

2. Steri-Tech maintains its principal place of business in Salinas, Puerto Rico.

3. Steri-Tech has no parent corporation.

4. No publicly held corporation owns 10% or more of Steri-Tech's stock.

# TABLE OF CONTENTS

**Page**

Preliminary Statement     **1**

Statement Regarding Oral Argument     **3**

Jurisdictional Statement     **3**

Statement of Issues Presented for Review     **4**

Statement of the Case     **5**

Statement of Facts     **8**

Summary of Argument     **26**

Legal Standard of Review     **28**

Argument     **31**

Conclusion and Relief Sought     **53**

Certificate of Compliance     **54**

Certificate of Filing and Service     **55**

# TABLE OF AUTHORITIES

| Cases | Page(s) |
|---|---|
| Adams v. EPA,<br>38 F.3d 43 (1st Cir. 1994) | 29, 42 |
| Arkansas v. Oklahoma,<br>503 U.S. 91 (1992) | 29 |
| Biestek v. Berryhill,<br>587 U.S. 97 (2019) | 30, 42 |
| Bowman Transp., Inc. v. Ark.-Best Freight Sys., Inc.,<br>419 U.S. 281 (1974) | 30 |
| Caribbean Petroleum Corp. v. EPA,<br>28 F.3d 232 (1st Cir. 1994) | 29 |
| Citizens Awareness Network, Inc. v. United States Nuclear<br>Regulatory Commission,<br>59 F.3d 284, 290 (1st Cir. 1995) | 28, 36 |
| Citizens to Preserve Overton Park v. Volpe,<br>401 U.S. 402, 416 (1971) | 30, 31, 47 |
| Dep't of Homeland Sec. v. Regents of the Univ. of California,<br>591 U.S. 1, 16, 140 (2020) | 28, 31 |

| Cases | Page(s) |
|---|---|
| Dist. 4 Lodge of the Int'l Ass'n of Machinists & Aerospace Workers Loc. Lodge 207 v. Raimondo, 18 F.4th 38, 44 (1st Cir. 2021) | 30, 36 |
| Dubois v. U.S. Dep't of Agric., 102 F.3d 1273 (1st Cir. 1996) | 30 |
| Marsh v. Or. Nat. Res. Council, 490 U.S. 360, 378, 109 (1989) | 30 |
| Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co., 463 U.S. 29, 41, 43, 103 S.Ct. 2856 77 L.Ed.2d 443 (1983) | 28, 29, 31, 47 |
| Penobscot Air Servs., Ltd. v. FAA, 164 F.3d 713, 720 (1st Cir. 1999) | 29, 30, 31, 51, 52 |
| Puerto Rico Aqueduct & Sewer Authority v. EPA, 35 F.3d 600, 604 (1st Cir. 1994) | 29 |
| Puerto Rico Sun Oil Co. v. EPA, 8 F.3d 73, 77 (1st Cir. 1993) | 29, 38 |

| Statutes | Page(s) |
|---|---|
| Administrative Procedure Act, 5 U.S.C. § 706 (2)(A) | 28, 31, 47 |
| Administrative Procedure Act, 5 U.S.C. § 706 (2)(E) | 30, 42 |

| Statutes | Page(s) |
|---|---|
| Clean Air Act,<br>    42 U.S.C. § 7401 et seq. | 2, 33,<br>50 |
| 42 U.S.C. § 7607(b)(1) | 4 |
| 28 U.S. Code § 1296 | 4 |
| 3 U.S. Code § 454 | 4 |

| Regulations | Page (s) |
|---|---|
| 40 C.F.R. § 63.360 et seq. (NESHAP Subpart O) | 12 |
| 40 C.F.R. § 63.362 | 7, 12, 49,<br>50, 51 |
| 40 C.F.R. § 63.362(b) | 52 |
| 40 C.F.R. § 63.362(c) | 43 |
| 40 C.F.R. § 63.363(a)(1) | 7, 43 |
| 40 C.F.R. § 63.363(b)(3) | 7, 43 |
| 40 C.F.R. § 63.363(f) | 47 |
| 40 C.F.R. § 63.364(c) | 47 |

| Other Authorities | Page(s) |
| --- | --- |

"Pesticide Registration Review; Interim Registration Review Decision for Ethylene Oxide (EtO); Notice of Availability," 90 Fed. Reg. pp. 3208–3209 (Jan. 14, 2025). ..... 11-12

## BRIEF FOR THE PETITIONER

Herein appears Petitioner **STERI-TECH, INC.** (hereinafter "STERI-TECH" or "Petitioner"), and very respectfully submits the following *Brief* in support of its *Petition for Review* before this Court:

## PRELIMINARY STATEMENT

Petitioner, STERI-TECH, is a Puerto Rico-based, wholly owned small business specializing in sterilization services for the Island's healthcare sector, particularly the medical device industry. Petitioner serves manufacturers of pacemakers, stents, insulin pumps, catheters, and other critical medical products, ensuring their sterilization at its facility in Salinas, Puerto Rico, before final packaging and distribution to medical institutions both locally and globally. The medical device industry is a cornerstone of Puerto Rico's economy and a vital supplier to healthcare markets worldwide.

The United States Environmental Protection Agency ("EPA"), Region 2, Caribbean Environmental Protection Division ("CEPD") (collectively "Respondent" or "EPA") has issued and *Order* setting forth certain *Findings of Fact* and *Conclusions of Law*, including that Petitioner had allegedly

violated certain regulations promulgated under the Clean Air Act ("CAA") in connection with certain activities at Petitioner's commercial ethylene oxide ("EtO") sterilization facility ("Facility") located in the municipality of Salinas, Puerto Rico. EtO is a gas used as a sterilizing agent for medical equipment, that is designated as a hazardous air pollutant under the CAA.

The central issue on appeal is whether the EPA acted arbitrarily and capriciously in ordering STERI-TECH to cease operation of its existing thermal oxidizer ("TO")—a device used to control EtO emissions at its facility—and mandating a transition to catalytic oxidation technology as the sole acceptable control method. The EPA's directive lacks scientific and technical justification and contradicts accepted engineering principles, particularly the practice of maintaining redundancy in emissions control systems. Moreover, the existing thermal oxidizer meets the destruction efficiency requirements established under the applicable National Emission Standards for Hazardous Air Pollutants ("NESHAP") regulations governing commercial sterilization facilities.

Petitioner seeks judicial review of the EPA's Order on grounds that several of the Agency's Findings of Fact are clearly erroneous and its Conclusions of Law are unsupported by substantial evidence. Accordingly,

the issuance of the Order constitutes arbitrary and capricious agency action and an abuse of discretion subject to judicial reversal under the Administrative Procedure Act.

## STATEMENT REGARDING ORAL ARGUMENT

Petitioner very respectfully submits that an oral argument is necessary in this case to better assist the Court in its decision.

## JURISDICTIONAL STATEMENT

On January 17, 2024, STERI-TECH filed a *Petition for Review* before this Court seeking for review of *Administrative Compliance Order* CAA-02-2024-1001 ("*Order*"), issued by the EPA pursuant to Section 113(a) of the CAA. A copy of the *Order*, issued on October 23, 2023, is attached as **Add001.**[1]

Pursuant to Section 307(b)(1) of the CAA, 42 U.S.C. §7607(b)(1), 28 U.S. Code § 1296 and 3 U.S. Code § 454 this Court has jurisdiction to hear the instant review as per Rule 15(a) of the Federal Rules of Appellate Procedure.

---

[1] References to the to the Addendum, in the **Add#** format, with the number corresponding to the pages therein. References to the Appendix within the Brief were left blank, as Petitioner had not yet received the complete, finalized Administrative Record with assigned page numbers. Accordingly, Petitioner indicated placeholders in the Brief where citations to the Index of the Administrative Record were inserted in the form of "**AR##.**

## STATEMENT OF ISSUES PRESENTED FOR REVIEW

The issues presented for review are:

- Whether the EPA acted arbitrarily and capriciously, and abused its discretion, by ordering Petitioner to permanently cease operation and disconnect its existing Thermal Oxidizer ("TO")—the air pollution control equipment approved by the EPA since 2000 for controlling ethylene oxide ("EtO") emissions at its facility—rather than allowing it to be maintained as an alternative or backup control device, despite the absence of substantial evidence in the administrative record supporting such directive.

- Whether the EPA erred in concluding that Petitioner failed to demonstrate the TO's compliance with the 99% EtO Destruction and Removal Efficiency ("DRE") standard at a lower minimum baseline temperature, where Petitioner was denied a fair and adequate opportunity to complete the required performance testing under an ongoing Request for Information ("RFI") process initiated by the EPA prior to issuance of the Order.

- Whether the EPA's finding that Petitioner failed to demonstrate compliance of the newly installed Catalytic Recuperative Oxidizer ("CRO") with the applicable NESHAP, Subpart O, was premature and unsupported by substantial evidence, where EPA had only recently approved the CRO's performance test protocol and Petitioner was in the process of coordinating testing with its contractor at the time the Order was issued.

## STATEMENT OF THE CASE

On October 23, 2023, Respondent issued the *Order* against Petitioner.

**Add001-022.** In the *Order*, Respondent sets forth certain *Findings of Fact* and *Conclusions of Law*, including that Petitioner had allegedly violated certain regulations promulgated under the CAA in connection with certain activities at Petitioner's commercial EtO sterilization Facility located in the municipality of Salinas, Puerto Rico.

Petitioner seeks judicial review of the *Order* because several of Respondent's *Findings of Fact* are clearly erroneous, and its *Conclusions of Law* are unsupported by substantial evidence. As a result, the *Order* was issued arbitrarily, capriciously, and in abuse of discretion, making it subject to judicial review.

On November 7, 2023, Petitioner met with EPA's CEPD in a conference to express concerns regarding specific *Findings of Fact* and *Conclusions of Law* in the *Order*. Petitioner requested that Respondent reconsider its findings and conclusions based on supporting evidence, but Respondent declined to do so. For example, in the *Order,* Respondent insisted on an oxidation temperature equivalent to 99.9% DRE that was never established in the operational permit or the applicable NESHAP, thus, wrongfully imposing a more restrictive destruction efficiency that required by the federal standard. This is evidenced by the *Finding of Fact* in paragraph 40 of the *Order*, where

Respondent admits that a test was necessary to determine the 99%-equivalent temperature, not 99.9%. Accordingly, Petitioner seeks review of the *Order*, particularly the *Findings of Fact* in paragraphs **35, 48, 53,** and **59, as** well as the *Conclusions of Law* in paragraphs **63, 64, 65,** and **66**.

As established in *Findings of Fact* **38, 39, 42, 43, 44, 45, 46**, and **47** of the *Order*, Petitioner fully complied with all of Respondent's demands to complete a performance test of the TO at its Facility, following a protocol duly approved by Respondent. Petitioner conducted the performance test in accordance with the EPA approved protocol, submitted a report detailing the results, and subsequently addressed Respondent's questions and concerns through two report addendums.

Rather than engaging in a scientifically objective and sound review of the alleged deficiencies, in order to complete the EPA required performance test and providing Petitioner, its consultant and contractor the opportunity to demonstrate compliance with the standard, Respondent rejected the test report on April 7, 2022—nearly five months after Petitioner had submitted its second addendum. Instead of allowing Petitioner to revise, supplement, or retest the TO, Respondent unilaterally ordered the permanent cessation and disconnection of the TO, even though the delegated state agency had

approved the required permits for the CRO, but had yet to be tested for its performance.

Petitioner asserts that Respondent erroneously concluded that it violated 40 C.F.R. §§ 63.362(c), 63.363(a)(1), and 63.363(b)(3), as well as Section 112 of the CAA. Also, that Respondent further erred in determining that Petitioner failed to demonstrate the TO's compliance with the 99% DRE NESHAP. Likewise, Respondent prematurely found that Petitioner failed to establish the CRO's compliance with the applicable 99% DRE NESHAP for sterilization chambers and aeration room emissions.

Petitioner had fully addressed Respondent's allegations regarding the *Findings of Fact* and *Conclusions of Law* in its *Reply* to *Notice of Violation* CAA-02-2021-1303, issued on June 29, 2021. The record demonstrates that Petitioner completed a performance test establishing that the TO at its Facility operated in compliance with NESHAP. Nevertheless, Respondent arbitrarily ordered its permanent disconnection.

Petitioner respectfully seeks judicial review of Respondent's *Order* and requests that it be permitted to proceed with additional performance testing of the TO. This would allow Petitioner to maintain the TO plus the CRO, having adequate redundancy to operate both systems in conjunction,

ensuring regulatory compliance and operational flexibility.

## STATEMENT OF FACTS

### A. About Steri-Tech, Inc.

1. **Petitioner's Business and Industry Role**: Petitioner is a Puerto Rico wholly owned small business that has been providing specialized sterilization services to the healthcare industry since 1986. It serves medical device manufacturers, including those producing pacemakers, stents, insulin pumps, catheters, and other similar products. These medical devices, once sterilized, are packaged at Petitioner's facility and distributed to medical institutions locally and worldwide.

2. **Economic Significance of the Medical Devices Industry:** The medical devices industry is a pillar of Puerto Rico's economy and a key supplier to global markets. Petitioner plays an integral role in this sector by ensuring the sterilization of critical medical products, supporting both public health and economic development.

3. **Facility Location and Operations**: Petitioner operates out of the Salinas Industrial Park, Municipality of Salinas, Puerto Rico, where its

sterilization processes take place within a leased industrial building owned by the Puerto Rico Industrial Development Company (PRIDCO) under the Puerto Rico Department of Economic Development (PRDEC). Additionally, Petitioner leases: two (2) additional buildings from PRIDCO for warehousing and offsite transportation, and a fourth building for unrelated operations.

4.      **Workforce and Employment Impact**: Petitioner employs an average of 45 full-time employees, most of whom are residents of Salinas and neighboring municipalities.

5.      **Regulatory and Certification Compliance**: Petitioner is:

*       Registered as a small business with the Small Business Administration.

*       Certified under the Historically Underutilized Business Zone (HUBZone).

*       A registered company under the Food and Drug Administration (FDA).

*       Certified business that operates in compliance with the international standards developed and published by the International Organization for Standardization (ISO).

## B.      The Sterilization Process

6.     The sterilization process begins when Petitioner receives pallets containing clients' medical products at the receiving area of its facility. These pallets are staged before being moved into one of four (4) sterilization chambers, depending on the chamber size, each chamber can accommodate between 6 to 16 pallets. Once loaded, the chamber is sealed, and EtO gas is introduced according to a pre-established and validated sterilization protocol. The EtO load and exposure time are product-specific to ensure proper sterilization. Upon completion of the sterilization cycle, the EtO gas is extracted from the chamber and sent to an emission control system, where it is destroyed through combustion (thermal oxidation). The remaining air, with trace amounts of EtO, is discharged through a stack (chimney). The CAA regulates these emissions of EtO, as it is considered a hazardous air pollutant.

7.     After EtO extraction, the sterilization cycle is complete, and the chamber is opened. The pallets are then transferred to one of four (4) aeration rooms, where any residual EtO evaporates from the products. The air from the aeration rooms is extracted and processed through the emission control unit, ensuring that any remaining EtO traces are also eliminated through combustion (thermal oxidation).

8. Once the aeration stage is completed, the sterilized pallets are transported to a separate warehouse building for temporary storage. Medical device manufacturers, Petitioner's clients, then collect the sterilized products for distribution to their respective centers. The final sterilized products are shipped worldwide.

9. EtO is a highly effective sterilant for medical devices and equipment due to its ability to penetrate materials, operate across a broad temperature range, and handle large throughput volumes. It is used in the sterilization of approximately 50% of all medical devices annually, including an estimated 95% of all surgical kits. Currently, no viable alternative exists for sterilizing certain medical devices and equipment. Without access to EtO sterilization, the availability of sterile medical devices would be significantly disrupted. In addition to medical applications, EtO is also used in the United States for processing and reconditioning dried herbs and spices, effectively reducing foodborne pathogens such as *Salmonella* and *Escherichia coli*. Environmental Protection Agency. See, "Pesticide Registration Review; Interim Registration Review Decision for Ethylene Oxide (EtO); Notice of Availability." Federal Register, vol. 90, no. 9, 14 Jan. 2025, pp. 3208-3209.

## C.    The Control of EtO Emissions

10.    Since 1994, the EPA has regulated emissions of EtO from commercial sterilization facilities like that of Petitioner under Subpart O of the National Emission Standards for Hazardous Air Pollutants (NESHAP), pursuant to the CAA. These regulations are codified at 40 C.F.R. Part 63, §§ 63.360 et seq.

11.    NESHAP Subpart O establishes the required Destruction and Reduction Efficiencies (DREs) for emission control units in sterilization facilities. The applicable DRE varies based on the facility's size and distinguishes between emissions from Sterilization Chamber Vents (SCV) and Aeration Room Vents (ARV).

12.    During the relevant period and until now, NESHAP Subpart O required a **99% DRE** for SCV emissions and a **99% DRE** *or* **a concentration limit of 1 part per million by volume (ppmv) for ARV emissions,** *whichever was less* *stringent*. See 40 C.F.R. § 63.362**.**

13.    Petitioner utilized a TO as its emission control unit during the pertinent years. The TO consists of a combustion chamber with a burner that consumes Liquid Propane Gas (LPG)**,** producing a flame temperature of approximately 3,500°F. The EtO-laden air from the SCV and ARV were fed

into the TO, where it underwent combustion. Given that the autoignition temperature of EtO is 833°F, far below the LPG flame temperature, the EtO was effectively destroyed through thermal oxidation.

14.     In addition to the use of the TO, Petitioner relied also on two (2) existing boilers that had been in operation since 1999, under a permit issued by the state agency Puerto Rico Environmental Quality Board (EQB)—now under the Puerto Rico Department of Natural and Environmental Resources (DNER)—with EPA approval as alternate control equipment, as the EPA's delegated agency. However, in 2021, the boilers were unilaterally removed by EPA request from the facility permit without any explanation. **AR C.7, App., pp. A___**

### D.     The Two (2) TO Performance Tests

15.     On **December 18, 2018,** the EPA conducted an on-site inspection of the Petitioner's facility ("December 2018 Inspection"). Petitioner received the EPA's inspection report approximately three months later on **March 1, 2019**. **AR A.1.**

16.     Following the inspection, and in light of the EPA's ongoing process of revising and amending EtO emission standards under NESHAP

Subpart O, Petitioner initiated an evaluation of new control technologies, in anticipation of more stringent new standards that were being informed by EPA personnel during the inspections. During this period, the EPA repeatedly urged Petitioner to install new emission control technology.

17. On **August 22, 2019,** the EPA issued a Request for Information ("2019 RFI") to Petitioner, requesting a new performance test and the submission of a Test Protocol for the TO by October 6, 2019. **AR B.1, App., pp. A___.**

18. On **November 11, 2019**, Petitioner submitted the Test Protocol to the EPA. **AR B.6, App., pp. A___.**

19. The Test Protocol underwent several revisions and modifications as part of the EPA's review and approval process. The new test protocol required a more challenging worst-case scenario for potential EtO emissions than the 1999 performance test protocol. The eight (8th) and final version of the Test Protocol was approved later (on **May 18, 2021**). **AR B.6, App., pp. A___.**

20. On **December 4, 2019**, the EPA conducted another on-site inspection of Petitioner's facility ("December 2019 Inspection").

21.     On **May 21, 2020**, the EPA issued a report for the December 2019 inspection. **AR A.7 and A.8, App., pp. A__**.

22.     During approximately a 16-month period, there were communications between Petitioner and Respondent regarding the review of the Protocol and responses to the RFI. **AR A.10, B.8, B.13 and B.14, App., pp. A__**.

23.     On **April 28, 2021**, the DNER issued a renewal of STERI-TECH's operations permit for the emission source. The permit established a DRE for the TO at **99%** pursuant to the requirement in NESHAP Subpart O and was set to expire on **April 28, 2026**.  It included the TO as the emissions control unit for the SCVs and two existing boilers as alternative emission control units for the ARVs, all as previously approved by EPA. **AR C.7, App., pp. A__**.

24.     Subsequently, on **November 8, 2021**, the DNER issued a permit modification to Petitioner, removing two boilers as alternative control units (previously acceptable to EPA as alternate control equipment) for the ARVs and designating the TO as the sole permitted control unit for both the SCV and ARV. The modification explicitly required compliance with the applicable NESHAP Subpart O (99% DRE). **AR C.8, App., pp. A__**.

25.    On **June 29, 2021**, the EPA issued STERI-TECH a Notice of Violation ("2021 NOV"). The 2021 NOV was predicated on the erroneous determination that the TO′s operating temperature was insufficient to achieve the required 99% DRE. Additionally, EPA alleged that STERI-TECH failed to convert strip chart data to record daily average oxidation temperatures whenever an instantaneous temperature recording fell below the stack controller temperature (when the oxidation temperature equivalent to 99% DRE was never formally established). The 2021 NOV also included erroneous allegations regarding a 1999 performance test and the filing of STERI-TECH′s permit renewal application with the EQB. **AR A.12, App., pp. A__.**

26.    On **July 8, 2021**, and after EPA′s insistence that Petitioner move to a new emission control technology, the CRO, Petitioner applied to DNER requesting a further modification to its permit to construct a new aeration room (Aeration Room #4) and install a CRO as the new control unit. DNER approved the construction permit on **July 26, 2022**, and issued the operations permit on October 6, 2022. **AR C.3, App., pp. A__.** Even though Petitioner requested in the permit application the TO as alternate control equipment, this new permit required compliance with NESHAP Subpart O, with the

CRO designated as the <u>sole</u> emission control unit, thereby eliminating the TO. Throughout the permit approval process, Respondent and DNER engaged in communications regarding the permit's issuance, during which EPA actively sought the removal of the TO and the two boilers as emission control units.

27. The newly issued permit **mentioned** in the equipment description a **99.9% DRE** performance for the CRO—but in the actual permit conditions require only **99% DRE** as prescribed by NESHAP Subpart O—subject to verification through performance testing. **AR C.3, App., pp. A__.**

28. On **July 15, 2021**, STERI-TECH conferred with EPA regarding the 2021 NOV. During this meeting, among other issues, STERI-TECH proposed conducting a new performance test on the TO, scheduled for **August 9, 2021**, with the temperature measured at the stack controller at approximately 900°F to establish a baseline operating oxidation temperature closer to 99% DRE for EtO (the NESHAP Subpart O standard). STERI-TECH memorialized the contents of this meeting in a letter to EPA **dated July 19, 2021**. **AR A.15, App., pp. A__.**

29. On **August 9, 2021**, following the EPA's approval of the Test Protocol, STERI-TECH conducted a performance test on the TO. The test

date was rescheduled multiple times to accommodate the availability of EPA representatives to witness the EPA-required performance test. Despite these accommodations and repeated scheduling adjustments at the agency's request, EPA representatives failed to attend the performance test.

30.     The results, as documented in the **October 6, 2021**, report, demonstrated a **DRE of 99.34**% at an average temperature of 900°F at a more challenging worst-case emissions scenario than the one used in the initial 1999 performance test. These findings are consistent with the results of the 1999 EPA-approved performance test (%DRE greater than 99%), further corroborating STERI-TECH's compliance with the applicable regulatory standards. **AR B.17, App., pp. A__**.

31.     On **October 13 and 15, 2021**, after the performance test report was filed, EPA sent comments regarding calibration curves in the report. **AR B.18 and B.19, App., pp. A__**.

32.     On **November 15, 2021**, Petitioner responded to EPA's comments on the calibration curves in the report. **AR B.20 and B.21, App., pp. A__**.

33.     Once STERI-TECH's contractor responded to the comments on the calibration curves and recalculated the DRE, the resulting **DRE increased to 99.438%**. **AR B.21, App., pp. A__**.

34.     The EPA did not respond to Petitioner's submission for several months. Then, on **April 7, 2022**, the EPA issued a letter rejecting the performance test results for the TO, asserting that the testing failed to demonstrate that the TO's operation achieved continuous compliance with the emission standards established under NESHAP Subpart O. In its rejection, the agency referenced various concerns that had not been previously raised or discussed with Petitioner's consultant or contractor. Despite the lack of substantive engagement, the EPA again insisted that Petitioner install new emissions control technology, specifically the CRO. **AR B.22 and B.23, App., pp. A__**.

35.     From October 2022 to June 2023, the startup and operation of the CRO encountered operational challenges, primarily due to the low explosive limit ("LEL") settings designed to protect the unit and the high concentration of EtO in the initial stages of extracted air from the SCV. In response to these startup malfunctions, Petitioner informed Respondent that it utilized the TO as a backup emissions control unit to ensure continued compliance with

regulatory requirements, and that it had also implemented modifications and enhancements to the CRO to address these startup issues and ensure its reliable operation. **AR D.9, D.10, D.11, D. 12, D. 13 and D.14, App., pp. A__.**

36.    On **September 22, 2023**, Petitioner submitted a draft version of the Test Protocol for the CRO to Respondent. Following multiple revisions to address Respondent's feedback, a total of four (4) revised versions were prepared. The final version, incorporating Respondent's comments, was completed by **August 17, 2023**. **AR D.1, D.2, D.3, D. 4, D.6, D.7 and D.8, App., pp. A__.**

37.    On **August 22, 2023**, Petitioner submitted the final Test Protocol to Respondent for final approval. The finalized version mandated compliance with a DRE of 99% as required under NESHAP Subpart O and as stipulated in the DNER operation permit. **AR D.7, App., pp. A__.**

38.    On **September 12, 2023**, Petitioner notified the EPA that the performance test was scheduled for the week of **November 6, 2023**, with test runs at the CRO set to take place on **November 8 and 9, 2023**. **AR D.34, App., pp. A__.**

39.     On **September 29, 2023**, the EPA issued a letter to Petitioner approving the Performance Test Protocol for the CRO, as submitted on **August 22, 2023**. **AR D.8, App., pp. A__.**

40.     On **October 23, 2023**—the same date the *Order* was issued—and despite the performance test having been scheduled for the week of **November 6, 2023**, with specific test runs for the CRO set for **November 8 and 9, 2023**, Respondent issued a second Notice of Violation ("2023 NOV") to Petitioner. Notably, the simultaneous issuance of both the *Order* and the NOV is procedurally inconsistent and raises due process concerns. Although the EPA asserted in the NOV that Petitioner could request a conference to discuss the alleged violations—purportedly affording an opportunity to submit additional information and present evidence relevant to the findings—this opportunity was illusory. By issuing the *Order* on the same date, the agency had already predetermined its position, rendering any such conference a perfunctory formality rather than a meaningful opportunity to be heard. **App., pp. A__.**

41.     The 2023 NOV alleged that Petitioner operated the TO as the emissions control unit, without a permit from DNER. This allegation is factually and legally incorrect. As of the date of the *Order*, Petitioner had

properly challenged the permit through the administrative process, and the matter was *sub judice* before an Examining Officer, pursuant to the Puerto Rico Uniform Administrative Procedure Act (Law No. 38 of June 30, 2017, as amended) and the DNER's Regulation for Public Hearings.

42.    As indicated, on **October 23, 2023**, the same day as the issuance of the 2023 NOV, Respondent also issued the *Order* that is the subject of this *Petition*. See **Add001.**

43.The *Order* required Petitioner to take the following actions:

(a) Disconnect the TO no later than **November 13, 2023**;

(b) Conduct a performance test of the CRO in accordance with the Test Protocol approved by Respondent on **August 17, 2023**, no later than **November 10, 2023**;

(c) Submit the report on the performance test to Respondent and DNER no later than **December 22, 2023**;

(d) Submit a written statement certifying compliance with the *Order* no later than **March 22, 2024**; and

(e) Submit all required documents with a certification under penalty of law.

44.    On **November 9, 2023**, following discussions with Respondent, Petitioner filed a request for an extension to conduct the performance test, citing circumstances beyond Petitioner's control. Specifically, the company

engaged to perform the test, Clean Air Engineering, had failed to bring the correct sampling equipment from their mainland facilities. **App., pp. A__.**

45.    Regardless of Petitioner's request for an extension, the performance test for the CRO was completed on **November 8, 2023,** and **January 11, 2024**. The test measured emissions from the ARV, and the results demonstrated compliance with NESHAP Subpart O. Specifically, the concentration of EtO was found to be below the detection limit of the approved EPA test method, which is twelve parts per billion (12 ppb), or 0.012 ppm. **App., pp. A__.**

46.    On **November 10, 2023**, Petitioner submitted a response to the Notice of Violation (NOV) issued by Respondent on **October 23, 2023**. **App., pp. A__.**

47.    On **December 27, 2023**, Petitioner submitted the sixth and final version of the Test Protocol for the performance test of the CRO for the SCV, incorporating a revised EPA-approved test method. **App., pp. A__.**

48.    On **January 11, 2024**, Petitioner successfully completed the performance test on the CRO for the SCV, rendering the order to conduct the same moot. **App., pp. A__.**

49.    Respondent's representatives witnessed the performance tests conducted in **November 2023**, but did not attend the January 2024 test.

50.    The performance test for the CRO on emissions from the SCV did not meet the DRE requirements under NESHAP Subpart O, primarily due to the testing conditions not being representative of normal operational conditions. Additionally, and as mentioned before, the CRO had been affected by issues encountered during its start-up process.

51.    After filing the instant *Petition for Review*, Petitioner engaged in several conferences and meetings with Respondent to discuss re-testing the CRO pursuant to a newly approved Test Protocol. Petitioner also requested Respondent to agree on continuing the performance testing of the TO. Respondent, albeit reluctantly, sent Petitioner a letter stating it did not object to the issuance of a temporary permit by the DNER to conduct the performance test on the TO. **App., pp. A__.**

52.    However, EPA later revised its position, characterizing the test to be conducted by Petitioner on the TO as a "Diagnostic Test," which it did not consider qualifying as a Performance Test.  The results of the Diagnostic Test on the TO confirmed compliance with the applicable NESHAP Subpart O, following the same Test Protocol previously evaluated and approved by

Respondent. Consequently, Petitioner and Respondent agreed to conduct new performance tests after repairs to the CRO, ensuring that the tests would be conducted under conditions representative of normal operations. These tests, performed after the filing of the *Petition for Review*, confirmed compliance with NESHAP Subpart O. **App., pp. A__.**

53.     Notwithstanding the foregoing, Petitioner has proactively procured a new and distinct emissions control technology, which is presently in the final stages of design and construction. This upgraded system is intended to comply with the upcoming requirement under NESHAP Subpart O mandating a 99.99% DDRE, scheduled to take effect in **March 2026**. Notably, the EPA has recently indicated that it may reconsider this standard as part of broader deregulatory initiatives.

54.     Since Respondent's initial inspection of Petitioner's facilities in 2018, and continuing thereafter, Respondent has insisted on the elimination of the TO and the installation of new technology. In response, Petitioner has already spent several million dollars and anticipates an additional expenditure of approximately $12 million on new control equipment to fully resolve any outstanding issues with Respondent. Petitioner has engaged environmental consultants to design the installation of this new emission

control equipment and has hired reputable contractors experienced in working with the EPA on protocols for performance tests, having successfully completed such tests in the past.

## SUMMARY OF ARGUMENT

This case arises from the EPA's premature and procedurally inconsistent issuance of the *Order* against Petitioner STERI-TECH, despite the company's sustained, good-faith efforts to comply with both federal and Commonwealth emissions control requirements. The *Order* is predicated on factual inaccuracies, regulatory misinterpretations, disregard for the ongoing administrative process before the DNER and unsupported conclusions.

First, the EPA's Order mischaracterizes STERI-TECH's coordination with federal authorities and its compliance with performance testing obligations. The company engaged in extensive planning and coordination with EPA, consultants, and contractors, notified the agency of scheduled tests, and completed performance tests within the prescribed timeframe. Issuing an enforcement order during this active compliance process was not

only unnecessary but also deprived STERI-TECH of a meaningful opportunity to complete its efforts and engage with the agency in good faith.

Second, the EPA's enforcement rationale is based on a misreading of the October 2022 Operation Permit issued by DNER. The EPA incorrectly applied a 99.9% DRE standard, whereas the applicable federal standard under NESHAP Subpart O is 99%. The permit's conditions explicitly align with this 99% standard, establishing compliance benchmarks that are consistent with federal law—not the elevated and unsupported threshold advanced by EPA.

Third, the issues raised in several key paragraphs of the *Order* are moot. At the time of issuance, performance testing had already been scheduled and was ultimately completed. The agency's refusal to await those results—despite having been timely notified—renders the *Order* procedurally infirm. EPA's disregard for the status of the administrative process and for Petitioner's testing schedule evidences a failure to exercise reasonable regulatory discretion, effectively coercing STERI-TECH into an unjustified course of action.

Finally, STERI-TECH has since undertaken a comprehensive upgrade of its emissions control systems to comply with forthcoming 2026 standards

under revised NESHAP Subpart O provisions — further demonstrating its ongoing commitment to full compliance.

For these reasons, the *Order* should be vacated as arbitrary, capricious, and contrary to law under the APA.

## LEGAL STANDARD OF REVIEW

Appellate review of agency action is governed by the Administrative Procedure Act ("APA"), 5 U.S.C. § 706(2)(A), under which courts afford substantial deference to final agency decisions. It has long been recognized that "[t]he agency's action ... may be set aside if found to be 'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.' " M*otor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.* 463 U.S. 29, 41, 103 S.Ct. 2856, 77 L.Ed.2d 443 (1983) (quoting 5 U.S.C. § 706(2)(A)); see also *Dep't of Homeland Sec. v. Regents of the Univ. of California,* 591 U.S. 1, 16, 140 S.Ct. 1891, 207 L.Ed.2d 353 (2020)  See also, *Citizens Awareness Network, Inc. v. United States Nuclear Regulatory Commission*, 59 F.3d 284, 290 (1st Cir. 1995) (citations omitted); see also *Puerto Rico Sun Oil Co. v. EPA*, 8 F.3d 73, 77 (1st Cir. 1993).

Deference is particularly heightened where an agency interprets its own regulations. See *Puerto Rico Aqueduct & Sewer Authority v. EPA*, 35 F.3d 600, 604 (1st Cir. 1994) (citing *Arkansas v. Oklahoma*, 503 U.S. 91, 111–12 (1992)). Although the scope of review is narrow, must be "searching and careful," "the court must undertake 'a thorough, probing, in-depth review' and a 'searching and careful' inquiry into the record." Penobscot Air Servs., Ltd. v. FAA, 164 F.3d 713, 720 (1st Cir. 1999).  See also *Adams v. EPA*, 38 F.3d 43, 49 (1st Cir. 1994). However, a court may not substitute its own judgment for that of the agency. See id.; see also *Caribbean Petroleum Corp. v. EPA*, 28 F.3d 232, 234 (1st Cir. 1994) (citing M*otor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983).

In determining whether agency action is arbitrary or capricious, courts assess whether the agency has relied on improper factors, failed to consider important aspects of the issue, or made a clear error in judgment. Although the scope of review is narrow, "the court must undertake 'a thorough, probing, in-depth review' and a 'searching and careful' inquiry into the record." *Penobscot Air Servs., Ltd. v. FAA*, 164 F.3d 713, 720 (1st Cir. 1999) (quoting *Citizens to Preserve Overton Park v. Volpe*, 401 U.S. 402, 416 (1971).

See also *Dist. 4 Lodge of the Int'l Ass'n of Machinists & Aerospace Workers Loc. Lodge 207 v. Raimondo*, 18 F.4th 38, 44 (1st Cir. 2021).

Additionally, under the APA, a reviewing court must set aside agency findings and conclusions that are unsupported by substantial evidence. 5 U.S.C. § 706(2)(E). In applying the substantial evidence standard, courts consider the administrative record as a whole and determine whether it contains "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Biestek v. Berryhill*, 587 U.S. 97, 102 (2019). "Only by 'carefully reviewing the record and satisfying [itself] that the agency has made a reasoned decision' can the court 'ensure that agency decisions are founded on a reasoned evaluation of the relevant factors.' " Id. (quoting *Marsh v. Or. Nat. Res. Council*, 490 U.S. 360, 378, 109 S.Ct. 1851, 104 L.Ed.2d 377 (1989) (alteration in original)). To put a finer point on the issue, "[w]hile this is a highly deferential standard of review, it is not a rubber stamp." Penobscot, 164 F.3d at 720 (quoting *Dubois v. U.S. Dep't of Agric.*, 102 F.3d 1273, 1285 (1st Cir. 1996)); see also *Bowman Transp., Inc. v. Ark.-Best Freight Sys., Inc.*, 419 U.S. 281, 285, 95 S.Ct. 438, 42 L.Ed.2d 447 (1974).

# ARGUMENT

## EPA'S ORDER IS ARBITRARY, CAPRICIOUS,
## AND AN ABUSE OF DISCRETION -

Under the APA, agency action must be set aside if it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A); *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 41 (1983); *Dep't of Homeland Sec. v. Regents of the Univ. of California*, 591 U.S. 1, 16 (2020). While judicial review is deferential, it must nevertheless be "thorough, probing, and in-depth," and the court must ensure that agency decisions are founded on a reasoned evaluation of relevant factors. See *Penobscot Air Servs., Ltd. v. FAA*, 164 F.3d 713, 720 (1st Cir. 1999); *Citizens to Preserve Overton Park v. Volpe*, 401 U.S. 402, 416 (1971).

Here, the EPA's findings and conclusions concerning STERI-TECH's compliance efforts, performance testing, and permit interpretations do not meet these standards and must be vacated.

### A. EPA's Findings of Fact Mischaracterize STERI-TECH's Compliance Efforts (Paragraphs 35–48.

1. *Paragraphs 35–48: STERI-TECH's Coordination with EPA and Testing Compliance.*

**Summary***:*

- **Paragraph 35:**

  EPA inspections (December 2018 and December 2019) revealed two main deficiencies:

  (a) The Thermal Oxidizer (TO) was not operated at the required minimum baseline temperature of 1,521°F (it operated between 700°F–900°F);

  (b) STERI-TECH lacked proper instrumentation to record or calculate daily average oxidation temperatures.

- **Paragraph 36:**

  In August 2019, EPA issued a Request for Information (RFI) requiring STERI-TECH to submit a new performance test protocol for the TO.

- **Paragraph 37:**

  STERI-TECH requested, and EPA granted, additional time to submit the protocol.

- **Paragraph 38:**

  In April 2021, the Puerto Rico DNER issued a renewed operating

  permit for the TO, valid until April 2026.

- **Paragraph 39**:

  STERI-TECH submitted a revised Test Protocol, which was approved

  by EPA on June 15, 2021.

- **Paragraph 40**:

  On June 29, 2021, EPA issued a Notice of Violation (NOV) citing

  various Clean Air Act violations.

- **Paragraph 41**:

  A conference was held between STERI-TECH and EPA on July 19,

  2021, and STERI-TECH conducted the TO performance test in August

  2021.

- **Paragraph 42**:

  On October 12, 2021, STERI-TECH submitted the performance Test

  Report to EPA for review.

- **Paragraph 43**:

  The next day, EPA provided comments identifying alleged

deficiencies in the Test Report and requested additional

documentation.

- **Paragraph 44**:

  STERI-TECH responded with two submissions (October 14 and

  October 28, 2021) attempting to address EPA's concerns.

- **Paragraph 45**:

  DNER modified STERI-TECH's operating permit to reflect that the

  TO be the sole authorized EtO control device after the removal of two

  boilers.

- **Paragraph 46**:

  On November 15, 2021, STERI-TECH submitted a second addendum

  to the Test Report.

- **Paragraph 47**:

  On April 7, 2022, EPA rejected the Test Report, citing data quality

  deficiencies and deviations from the approved protocol, concluding

  that the TO's operation did not demonstrate continuous compliance

  with NESHAP Subpart O.

- **Paragraph 48**:

  Since EPA's rejection of the Test Report, STERI-TECH has not

conducted a new performance test of the TO to demonstrate compliance.

The EPA's findings improperly portray STERI-TECH's coordinated efforts to complete complex performance testing for the TO. Despite environmental testing inherently requiring precision, planning, and repetition, STERI-TECH diligently addressed each EPA request, submitted a revised test protocol, conducted testing, and responded comprehensively to EPA's concerns. Petitioner consistently coordinated with EPA staff, consultants, and independent contractors to complete complex emissions testing, which necessarily demanded precise environmental conditions, careful planning, and occasional retesting to ensure data validity.

STERI-TECH proactively offered to retest its Thermal Oxidizer ("TO") and successfully completed the required performance test for its Catalytic Reduction Oxidizer ("CRO"). Despite these substantial compliance efforts, EPA issued the *Order* **while testing was still ongoing**—a premature action unsupported by the administrative record and in violation of the APA's arbitrary-and-capricious standard.

Issuing an enforcement *Order* while testing was underway is a classic example of an arbitrary and capricious action—one not based on full consideration of relevant factors. See *Dist. 4 Lodge of the Int'l Ass'n of Machinists & Aerospace Workers Loc. Lodge 207 v. Raimondo*, 18 F.4th 38, 44 (1st Cir. 2021); *Citizens Awareness Network, Inc. v. United States Nuclear Regulatory Commission*, 59 F.3d 284, 290 (1st Cir. 1995).

**2.** ***EPA's Misinterpretation of the DNER Permit Imposes an Unlawful Standard (Paragraphs 49–52)***

**Summary**

- **Paragraph 49:**

  On July 8, 2021, STERI-TECH applied to the Puerto Rico DNER requesting to modify its construction permit. The purpose was to authorize the construction of a new aeration room (#4) and install a Catalytic Recuperative Oxidizer ("CRO") as the new emissions control device for sterilization and aeration rooms.

- **Paragraph 50:**

  On July 26, 2022, DNER approved the construction permit, authorizing STERI-TECH to build the new aeration room and install the CRO as the EtO emissions control device.

- **Paragraph 51:**

  On August 29, 2022, STERI-TECH submitted another application to DNER to modify its existing operation permit, requesting permission to operate the newly installed CRO.

- **Paragraph 52:**

  On October 6, 2022, DNER issued a modified operating permit (the "October 2022 Operation Permit") allowing STERI-TECH to operate the CRO. This permit superseded all previous permits and is effective until April 28, 2026.

The EPA's enforcement posture is also premised on a misreading of STERI-TECH's October 2022 DNER-issued Operation Permit. Contrary to EPA's assertion, the permit requires only a 99% destruction removal efficiency ("DRE") for sterilization chamber vents and aeration room vents, consistent with the federal NESHAP Subpart O standard at 40 C.F.R. Part 63, not a heightened 99.9% DRE standard.

Specifically, the permit's Special Conditions (Nos. 15 and 16) establish a 99% DRE for Sterilization Chamber Vents ("SCVs") and a 99% DRE or 1 ppmv (whichever is less stringent) for Aeration Room Vents ("ARVs").

These permit conditions are consistent with federal NESHAP-under 40 C.F.R. Part 63, Subpart O- which establishes a 99% DRE for EtO control, not 99.9%. As such, the EPA's enforcement claim—based on a higher, non-applicable standard—constitutes a deviation from governing federal law. Requiring a higher standard is not based on scientific evidence nor supported by supporting technical data or determinations. In addition, there is no different standard at the state level.

EPA's reliance on a 99.9% DRE requirement misreads STERI-TECH's October 2022 DNER permit, which aligns with the 99% standard set by NESHAP Subpart O at 40 C.F.R. Part 63. Agencies may not impose stricter standards absent regulatory authority or scientific justification. See *Puerto Rico Sun Oil Co. v. EPA*, 8 F.3d 73, 77 (1st Cir. 1993). This deviation from governing law, without reasoned explanation or evidence, renders the EPA's actions arbitrary and capricious. See *State Farm*, 463 U.S. at 43 (agency action must articulate a satisfactory explanation based on relevant data).

**3.    *EPA's Enforcement Action is Moot Given STERI-TECH's Timely Testing Efforts (Paragraphs 53–59)***

**Summary:**

- **Paragraph 53**:

  The October 2022 Operation Permit issued by DNER required STERI-TECH to conduct a performance test to prove that the new Catalytic Recuperative Oxidizer ("CRO") achieved a 99.9% ethylene oxide removal efficiency for sterilization chambers and aeration rooms.

- **Paragraph 54:**

  After the permit was issued, STERI-TECH attempted to start up the CRO multiple times (October 2022, January 2023, and March 2023). However, each attempt faced detonation incidents caused by the Lower Explosive Limit ("LEL") of the gas mixture exceeding programmed thresholds, triggering automatic shutdowns.

- **Paragraph 55**:

  To resolve the operational issues, STERI-TECH invested in major automation upgrades, installing Variable Frequency Drives (VFDs) and Programmable Logic Controllers (PLCs) on sterilization chamber pumps to better control gas flow.

  They also added real-time monitoring systems and lowered the LEL

setpoint from 25% to 8% to ensure safer and more stable CRO operations.

- **Paragraph 56**:

  STERI-TECH ran multiple simulations, and test runs across different operational scenarios, making further equipment adjustments like replacing LEL sensors and fine-tuning programming to enhance CRO reliability.

- **Paragraph 57**:

  On August 22, 2023, STERI-TECH submitted to the EPA a new performance test protocol for the CRO. They planned and confirmed the performance test to occur during the week of November 6, 2023.

- **Paragraph 58**:

  The CRO began continuous operation at the facility on September 4, 2023.

- **Paragraph 59**:

  As of the date of the *Order* (October 23, 2023), the required performance test had not yet been conducted, and therefore compliance with the NESHAP Subpart O standard for the CRO had not yet been demonstrated.

The findings in these paragraphs are moot. STERI-TECH had scheduled and initiated performance testing for the CRO before the EPA issued its Order. STERI-TECH had scheduled and provided timely notice to EPA of performance tests for the CRO prior to the issuance of the *Order*. Nevertheless, EPA issued the *Order* without awaiting test results—despite the fact that performance testing was already underway and, indeed, completed shortly thereafter.

Despite operational challenges common to new equipment start-ups, STERI-TECH submitted a revised protocol, conducted necessary adjustments, and completed testing within the window allowed by EPA. The tests were conducted within the 90-day window set by EPA following the agency's approval of the initial Test Protocol. Specifically, the performance test for the aeration room took place in November 2023. Due to equipment issues beyond Petitioner's control involving its contractor, Clean Air Engineering, the sterilization chamber test was rescheduled and conducted in January 2024. EPA approved a revised protocol in December 2023 but declined to witness the January test.

EPA's issuance of the *Order* was therefore unnecessary and, Petitioner respectfully submits, indicative of overreach—effectively pressuring

Petitioner into a course of action unsupported by factual or procedural justification. STERI-TECH has demonstrated continuous compliance efforts, including repeated offers to retest the TO and the completion of the CRO test. These actions reflect diligence and good faith. Further, the technical nature of these tests necessarily entails precision, scheduling flexibility, and in some cases, repetition to ensure accuracy and regulatory validity. The EPA's issuance of the *Order* prior to the completion of testing—without awaiting results—constitutes a clear error in judgment and fails to consider material facts. See *Adams v. EPA*, 38 F.3d 43, 49 (1st Cir. 1994) (judicial review ensures agencies act based on a rational assessment of the record).

**B.** **EPA's Legal Conclusions Are Unsupported by Substantial Evidence.**

An agency's findings must be supported by substantial evidence. 5 U.S.C. § 706(2)(E); *Biestek v. Berryhill*, 587 U.S. 97, 102 (2019). Substantial evidence means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Id*.

Here, EPA's legal conclusions fail that standard.

*1.* *Conclusion of Law 63 and Finding of Fact 48: Compliance with 40 C.F.R. §§ 63.362(c), 63.363(a)(1), and 63.363(b)(3)*

Conclusion of Law 63 and Finding of Fact 48 in the *Order* provide as follows:

> Conclusion of Law 63 of the Order states that:
>
> "*Respondent is in violation of 40 C.F.R. §§ 63.362(c), 63.363(a)(1), and 63.363(b)(3), and Section 112 of the Act, for failing to operate the thermal oxidizer at the required minimum baseline temperature to achieve 99% destruction of EtO emissions from the sterilization chambers.*"
>
> Findings of Fact 48 of the Order find that:
>
> "*Since EPA's rejection of the Test Report in April 2022, Respondent has not conducted a performance test of the thermal oxidizer to demonstrate compliance with the emission standards for the sterilization chambers and aeration rooms established by NESHAP Subpart O.*"

Here, Respondent alleges that STERI-TECH violated the CAA by failing to operate the TO at the required minimum baseline temperature to achieve 99% DRE. However, this conclusion is unsupported by the best available scientific evidence and contradicts the results of past performance tests. To wit:

The 1999 Performance Test demonstrated 100% EtO DRE for the TO when operated at a controller set point of 1,500°F. In 2021, STERI-TECH conducted another performance test pursuant to an EPA-approved protocol, which again confirmed compliance with the 99% DRE for the TO. Despite

multiple scheduling accommodations for EPA's presence, the agency failed to attend the test. The performance test results were submitted to the EPA on October 12, 2021, confirming compliance with the 99% DRE. However, on October 13, 2021, the EPA requested additional information and identified alleged deficiencies in the report. In response, STERI TECH, through its contractor, addressed the agency's comments and submitted a revised report on October 14, 2021, where the DRE improved even more. Then EPA submitted new comments which were addressed in and further addendums provided on October 26, 2021, and November 15, 2021, to fully address the EPA's new comments.

After over five months of inaction, in April 2022 EPA unilaterally rejected the performance test and instead, insisted on the shutdown of the TO in favor of the CRO—a requirement not mandated by regulation. This arbitrary decision lacks justification and is inconsistent with EPA's own past approvals of STERI-TECH's emissions control technology.

Rather than affording the Petitioner the opportunity to review, discuss, and correct the alleged deficiencies identified in its rejection letter, the EPA instead directed STERI-TECH to "take all actions and submit any additional information that is necessary for issuance of the final construction

permit by DNER for the CRO and to permanently cease operation of the TO once the CRO was permitted and operational." **AR B.3, App., pp. A__**. This unilateral directive lacked justification.

Despite this, STERI-TECH continued to cooperate closely with the EPA in implementing the new CRO technology at its facility. The EPA then pretended Petitioner to enter into a consent order and a consent agreement/final order with a proposed penalty of close to half a million dollars. Petitioner objected since, as reflected in the *Order*, STERI-TECH, in coordination with the EPA, had been implementing everything requested by EPA, in good faith and with the intention of collaborating with an enforcing agency to what the agency was demanding, proceeded with the necessary tasks for the CRO's installation and operation.

On August 29, 2022, STERI-TECH applied to DNER to modify its existing permit in order to operate the CRO as the facility's emission control device, as required by the EPA's rejection letter. On October 22, 2022, the DNER issued a modified permit ("October 2022 Operation Permit"), authorizing STERI-TECH to operate the CRO for EtO emissions control. This permit remains in effect until April 28, 2026.

STERI-TECH also applied for a Temporary Permit from DNER to allow the CRO's start-up process, with the EPA's endorsement. However, DNER maintained that a temporary permit was unnecessary and required STERI-TECH to submit a permanent permit application. Despite being fully aware that the CRO required a start-up period, the DNER insisted on a permanent permit. Throughout this process, the EPA was routinely informed and even inspected the facility.

substantial evidence in the administrative record.

The record demonstrates that STERI-TECH's 1999 and 2021 tests both achieved over 99% DRE, confirming the TO's compliance. The EPA's rejection—after multiple submissions and months of inaction—lacks a reasoned explanation, thus rendering its decision arbitrary and capricious. Despite these facts, EPA unilaterally rejected the results after months of inaction and improperly insisted on permanent TO shutdown—an arbitrary requirement unsupported by either NESHAP regulations or the administrative record. See *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983).

EPA's decision to mandate the shutdown of the TO and require reliance solely on the CRO, without sufficient basis in the administrative

record, constitutes arbitrary and capricious decision-making, as well as an abuse of discretion. 5 U.S.C. § 706(2)(A). See also, *Overton Park*, 401 U.S. at 416.

### 2. *Conclusion of Law 64: Alleged Failure to Record Daily Average Oxidation Temperature*

Conclusion of Law 64 of the *Order* states that:

"*Respondent violated 40 C.F.R. §§ 63.363(f) and 63.364(c), and Section 112 of the Act, for failing to convert strip chart data to record a daily average oxidation temperature each day any instantaneous temperature recording of the thermal oxidizer falls below the minimum baseline temperature.*"

As noted above, on June 29, 2021, the EPA issued a Notice of Violation (NOV) to STERI-TECH.

On July 15, 2021, STERI-TECH and the EPA held a conference to discuss their respective positions regarding the NOV. Subsequently, on July 19, 2021, STERI-TECH submitted a response letter to the EPA, summarizing its position and providing supporting documents and information rebutting the EPA's findings and conclusions.

As part of these discussions, STERI-TECH and the EPA agreed to conduct an additional performance test pursuant to an EPA-approved Test Protocol. The purpose of this test was to better approximate the temperature set point in the TO necessary to achieve an EtO removal efficiency of 99% or

greater (at a mutually agreed TO oxidation temperature of 900 F). However, a factual dispute remains as to whether STERI-TECH ever operated below an average daily oxidation temperature corresponding to a 99% destruction removal efficiency (DRE), *__as all prior testing results demonstrate compliance__*.

Nevertheless, STERI-TECH agreed to retain an automation and instrumentation contractor to develop and implement an algorithm to convert strip chart data into a daily average oxidation temperature. This system would record a daily average whenever any instantaneous temperature reading from the strip chart recorder fell below the TO's minimum temperature threshold. T

This will be a temporary measure now since the new NESHAP Subpart O standard, to be effective on April 6, 2026, does not allow this type of data conversion as a compliance alternative for thermal oxidizers. STERI-TECH voluntarily implemented data conversion measures to record daily averages, demonstrating a commitment to compliance even though upcoming NESHAP revisions would make such requirements obsolete.

The EPA's insistence on retroactive compliance measures, without recognizing STERI-TECH's interim good-faith efforts, fails to consider

material developments and thus constitutes arbitrary decision-making. See *Raimondo*, 18 F.4th at 44. STERI-TECH maintains that it has fully complied with all applicable requirements. Accordingly, the EPA's order is both moot and unnecessary.

### 3. Conclusion of Law 65: Alleged Failure to Demonstrate TO Compliance with 99% Efficiency Standard

Conclusion of Law 65 of the Order states that:

> "*Respondent failed to demonstrate that the existing thermal oxidizer is operated in compliance with the applicable 99% efficiency standard for reducing EtO emissions, in violation of 40 C.F.R. § 63.362 of NESHAP Subpart O.*"

The EPA's assertion that STERI-TECH failed to demonstrate compliance is baseless. The EPA has never previously alleged or included this purported violation in any prior Notice of Violation (NOV) issued to STERI-TECH. At no point has the EPA notified STERI-TECH that it allegedly "failed to demonstrate that the existing thermal oxidizer is operated in compliance with the applicable 99% efficiency standard for reducing EtO emissions." *Id.* Furthermore, there is no scientific evidence supporting this conclusion. STERI-TECH position is that both the 1999 test (approved as complaint by EPA) and the 2021 test (requested by EPA) showed a %DRE

greater than 99% DRE for EtO as required by the applicable NESHAP Subpart O standard.

The EPA's Order violates Section 113(a)(1) of the Clean Air Act, which requires the EPA Administrator to provide at least 30 days' notice after issuing an NOV before taking enforcement action. The *Order* is therefore premature. Additionally, Section 63.362 of NESHAP Subpart O does not impose an affirmative obligation on a source owner or operator to "demonstrate" compliance. Providing such an opportunity is the proper procedural course.

STERI-TECH has acted in good faith and in close coordination with the EPA to conduct necessary testing and demonstrate compliance with applicable standards. To date, all performance test results for the TO have demonstrated an emission reduction efficiency exceeding 99%. The agency's failure to engage in a meaningful review of STERI-TECH's data, coupled with its demand for TO shutdown without regulatory basis and supporting substantial evidence, renders this conclusion arbitrary, capricious, and an abuse of discretion. Where the administrative record demonstrates STERI-TECH's reasonable, good-faith compliance efforts—including successful

historical and contemporaneous testing—agency findings, to the contrary are unsustainable. See *Penobscot*, 164 F.3d at 720.

### 4. Conclusion of Law 66: Alleged Failure to Demonstrate CRO Compliance.

Conclusion of Law 66 of the Order states that:

> *"Respondent failed to demonstrate that the CRO is operated in compliance with NESHAP Subpart O, to assure continuous compliance with the applicable 99% efficiency standard for sterilization chambers and aeration room emissions, in violation of 40 C.F.R. § 63.362."*

STERI-TECH's rebuttal to this conclusion aligns with its response to Conclusion of Law in paragraph 65. Additionally, STERI-TECH clarifies that during the startup phase of the CRO, the device was operated above the manufacturer's recommended baseline operating temperature of 350°F. This precaution was taken to provide a margin of safety and contingency in case of malfunctions, which are common during the startup process.

STERI-TECH applied for the necessary permits from the DNER and has since completed the required performance test for the CRO under a Test Protocol approved by the EPA.

Moreover, 40 C.F.R. § 63.362(b) explicitly states:

*"Applicability of emission limits. The emission limitations of paragraphs (c), (d), and (e) of this section apply during sterilization operation. The emission limitations do not apply during periods of malfunction."*

Accordingly, any temporary deviations occurring during the startup period do not constitute a violation under the regulation, STERI-TECH was never in violation of the standard. Further, STERI-TECH has since completed CRO performance testing under an EPA-approved protocol, confirming compliance. Where the administrative record demonstrates STERI-TECH's reasonable, good-faith compliance efforts—including successful historical and contemporaneous testing—agency findings, to the contrary are unsustainable. See *Penobscot*, 164 F.3d at 720.

## CONCLUSION AND RELIEF SOUGHT

Based on the foregoing, it is respectfully submitted that this Court should grant the *Petition* filed in this case. STERI-TECH has consistently acted in good faith, worked closely with the EPA, and undertaken all necessary measures to demonstrate full compliance with NESHAP Subpart O. The EPA's insistence on permanently shutting down the Thermal Oxidizer ("TO")—despite its proven effectiveness over more than two

decades, and without substantial supporting evidence—constitutes arbitrary and capricious agency action. Its refusal to recognize STERI-TECH's 1999 and 2021 performance test results further underscores the lack of reasoned decision-making. For these reasons, the Order should be vacated, and STERI-TECH should be permitted to continue operating the TO as it had from 1999 through 2022.

**RESPECTFULLY SUBMITTED**.

In Guaynabo, Puerto Rico, this 28th day of April 2025.

*/s/Lizabel M. Negrón-Vargas*
Lizabel M. Negrón-Vargas, Esq.
USCA-01 15106
Tel: 787-392-0450 Fax: 787-281-0708
PO Box 360764
San Juan, PR 00936-0764
lizanegron@yahoo.com

*/s/Rafael A. Toro-Ramírez*
Rafael A. Toro-Ramírez, Esq.
rtoro@toro-arsuaga.com
USCA-01 27304

TORO & ARSUAGA, LLC
P.O. Box 11064
San Juan, P.R. 00922-1064
Tel 787.299-1100
Fax 787.793.1146

# CERTIFICATE OF COMPLIANCE

The undersigned counsel for the Petitioner certifies that the foregoing *Brief* complies with the type-volume limitations under Rule 32(a)(7)(B)(I) of the Federal Rules of Appellate Procedure and the Local Rules for the U.S. Court of Appeals, First Circuit. The Brief has been prepared using 14 point, proportionally spaced Book Antiqua typeface in Microsoft Word program. Exclusive of table of contents, table of authorities, service list, and certificate of service, the Brief contains **9265** words.

### RESPECTFULLY SUBMITTED.

*/s/Lizabel M. Negrón-Vargas*
Lizabel M. Negrón-Vargas, Esq.
USCA-01 15106
Tel: 787-392-0450 Fax: 787-281-0708
PO Box 360764
San Juan, PR 00936-0764
lizanegron@yahoo.com

*/s/Rafael A. Toro-Ramírez*
Rafael A. Toro-Ramírez, Esq.
rtoro@toro-arsuaga.com
USCA-01 27304

TORO & ARSUAGA, LLC
P.O. Box 11064
San Juan, P.R. 00922-1064
Tel 787.299-1100
Fax 787.793.1146

## CERTIFICATE OF FILING AND SERVICE

**I HEREBY CERTIFY** that on this date, pursuant to Fed. R. App. P. 25(d), the foregoing *Brief for the Petitioner*, was filed through the CM/ECF system and I certify that counsel of record for the adverse and interested parties are registered as ECF Filers and included in the Service List with preference of email service, and as such they will be automatically served copies by the CM/ECF System.

**RESPECTFULLY SUBMITTED.**

*/s/Lizabel M. Negrón-Vargas*
Lizabel M. Negrón-Vargas, Esq.
USCA-01 15106
Tel: 787-392-0450 Fax: 787-281-0708
PO Box 360764
San Juan, PR 00936-0764
lizanegron@yahoo.com

*/s/ Rafael A. Toro-Ramírez*
Rafael A. Toro-Ramírez
rtoro@toro-arsuaga.com
USCA-01 27304

TORO & ARSUAGA, LLC
P.O. Box 11064
San Juan, P.R.  00922-1064
Tel 787.299-1100
Fax 787.793.1146

# ADDENDUM

## INDEX TO ADDENDUM

| *Description of Document* | *Pages* |
|---|---|
| *Administrative Compliance Order* CAA-02-2024-1001 | **Add1-22** |



October 23, 2023

<u>*Via Electronic Mail*</u> – *avivoni@steri-tech.com*

Andrés Vivoni
Vice President and General Manager
Steri-Tech, Inc.
Road 701 Km. 0.7
P.O. Box 1145
Salinas, Puerto Rico 00751

**Re:    Administrative Compliance Order: EPA Docket No. CAA-02-2024-1001**

Dear Mr. Vivoni:

Pursuant to the Clean Air Act (CAA), 42 U.S.C. § 7401 *et seq.*, at Section 113(a)(3), 42 U.S.C. §7413(a)(3), the U.S. Environmental Protection Agency (EPA), Region 2, issues the enclosed Administrative Compliance Order (Order) to Steri-Tech Inc., for CAA violations at its commercial sterilization facility located in Salinas, Puerto Rico (the Facility).

Specifically, EPA has determined that the Facility is in violation of the requirements of the National Emission Standards for Hazardous Air Pollutants for ethylene oxide commercial sterilization and fumigation operations codified at 40 C.F.R. Part 63, Subpart O. The Order requires the Facility to take actions to come into compliance with the aforementioned regulation and applicable requirements.

The Order contains specific information concerning how to request a conference with EPA. If you have any questions, or would like to schedule a conference, please contact Alex Rivera, at (787) 977-5845 or by email at Rivera.Alex@epa.gov, or have your attorney contact Evelyn Rivera-Ocasio, Assistant Regional Counsel within the Office of Regional Counsel, at (787) 977-5859 or by email at Rivera-Ocasio.Evelyn@epa.gov.

Sincerely,

CARMEN
GUERRERO PEREZ
Digitally signed by CARMEN
GUERRERO PEREZ
Date: 2023.10.23 15:11:04
-04'00'

Carmen R. Guerrero Pérez, Director
Caribbean Environmental Protection Division

Enclosure: Administrative Compliance Order

cc: Amarilys Rosario, Chief Air Quality Area, DRNA, amarilysrosario@drna.pr.gov

**UNITED STATES ENVIRONMENTAL PROTECTION AGENCY**

**REGION 2**

<table>
<tr>
<td>
In the Matter of:

Steri-Tech, Inc<br>
Road 701 Km. 0.7<br>
Salinas, Puerto Rico,

Respondent.

Proceeding under Section 113(a) of<br>
the Clean Air Act, 42 U.S.C. § 7413(a)
</td>
<td>
ADMINISTRATIVE COMPLIANCE<br>
ORDER<br>
CAA-02-2024-1001
</td>
</tr>
</table>

## ADMINISTRATIVE COMPLIANCE ORDER

### A. Preliminary Statement

1.  The Director of the Caribbean Environmental Protection Division ("Director") of the United States Environmental Protection Agency ("EPA"), Region 2, issues this Administrative Compliance Order ("Order"), pursuant to Section 113(a) of the Clean Air Act ("CAA" or "the Act"), 42 U.S.C. § 7413(a), to Steri-Tech, Inc. ("STI" or "Respondent"), for alleged violations of the Act at its commercial ethylene oxide ("EtO") sterilization facility ("Facility"), located at Road 701 Km. 0.7, in the municipality of Salinas, Puerto Rico. EPA alleges in this Order that Respondent violated applicable requirements in the "Ethylene Oxide Emissions Standards for Sterilization Facilities" at 40 C.F.R. Part 63, Subpart O, §§ 63.360 *et seq*. (" NESHAP Subpart O")

**Statutory and Regulatory Background**

2. Section 302(e) of the CAA provides that, whenever the term "person" is used in the Act, the term includes an individual, corporation, partnership, association, State, municipality, political subdivision of a State, and any agency, department, or instrumentality of the United States and any officer, agent, or employee thereof. *See* 42 U.S.C. § 7602(e).

3. Section 113(a)(3) of the Act authorizes the EPA Administrator to, among other actions, issue compliance orders to any person whenever, on the basis of any information available to EPA, the Administrator finds that such person has violated or is in violation of any requirement or prohibition of Title I of the Act (other than compliance with a state implementation plan), or of any regulation promulgated pursuant to Section 112 of the Act.

4. Pursuant to EPA Delegation of Authority 7-6-A and EPA Region 2 Delegation of Authority 7-6-A, the authority to make findings of a violation and to issue a CAA Section 113(a) Compliance Order has been delegated to the Director by the EPA Administrator through the Region 2 Regional Administrator.

5. This Order is issued to the Respondents for alleged violations at the Facility of Section 112 of the CAA, 42 U.S.C. § 7412, and of the NESHAP Subpart O, which EPA promulgated pursuant to Section 112 of the Act.

<u>The Clean Air Act</u>

6. Section 112 of the Act requires the Administrator to publish a list of hazardous air pollutants ("HAPs"), a list of categories and subcategories of major and area sources of listed HAPs, and to promulgate regulations establishing emission standards, referred to as National

Emissions Standards for Hazardous Air Pollutants ("NESHAPs"), for each category or subcategory of major and area sources of HAP.

7. Section 112(a) of the Act contains definitions relevant to Section 112. Specifically:

    a. Section 112(a)(1) of the Act defines "major source" as any stationary source or group of stationary sources located within a contiguous area and under common control that emits or has the potential to emit considering controls, in the aggregate 10 tons per year or more of any hazardous air pollutant or 25 tons per year or more of any combination of hazardous air pollutants.

    b. Section 112(a)(2) of the Act defines "area source" as any stationary source of hazardous air pollutants that is not a major source.

    c. Section 112(a)(6) of the Act defines "hazardous air pollutant" as any air pollutant listed pursuant to Section 112(b) of the Act.

    d. Section 112(a)(9) defines "owner or operator" as any person who owns, leases, operates, controls or supervises a stationary source.

8. Section 112(b)(1) of the Act provides the initial list of HAPs and Section 112(b)(2) of the Act requires the Administrator to periodically review the list and, where appropriate, revise it.

9. Section 112(c) of the Act requires the Administrator to publish a list of categories or subcategories of major and area sources of listed HAPs.

10. Section 112(d) of the Act requires the Administrator to promulgate regulations establishing NESHAPs for each category or subcategory of major and area sources of HAPs. NESHAPs promulgated under the CAA as it existed prior to the 1990 CAA amendments are set forth in 40 C.F.R. 61.

11. Section 112(i)(3)(A) of the Act prohibits the operation of a source in violation of any emissions standard, limitation or regulation issued pursuant to Section 112 of the Act and directs the Administrator to set a compliance deadline for existing sources that is no more than 3 years after the effective date of the standard

NESHAP for Ethylene Oxide Commercial Sterilization and Fumigation Operations

12. Pursuant to Section 112 of the Act, 42 U.S.C. § 7412, EPA promulgated the Ethylene Oxide Emission Standards for Sterilization Facilities, which are codified at 40 C.F.R. Part 63, Subpart O, §§ 63.360 *et seq*. ("NESHAP Subpart O"). *See* 59 Fed. Reg. 62589 (Dec. 6, 1994) (as amended).

13. Pursuant to 40 C.F.R. § 63.360(a), all sterilization sources using 1 ton of ethylene oxide ("EtO") in sterilization or fumigation operations are subject to the emission standards in 40 C.F.R. § 63.362, except as specified in paragraphs (b) through (e) of 40 C.F.R § 63.360.

14. 40 C.F.R. § 63.362(c) provides that the owner or operator of a sterilization source using 1 ton of EtO shall reduce EtO emissions to the atmosphere by at least 99 percent from each sterilization chamber vent.

15. 40 C.F.R. § 63.362(d) provides that the owner or operator of a sterilization source using 10 tons of EtO shall reduce EtO emissions to the atmosphere from each aeration room vent to a maximum concentration of 1 ppmv or by at least 99 percent, whichever is less stringent, from each aeration room vent.

16. Pursuant to 40 C.F.R. § 63.363(a)(1), the owner or operator of a source subject to emissions standards in 40 C.F.R. § 63.362 shall conduct an initial performance test using the procedures

listed in 40 C.F.R. § 63.7 according to the applicability in Table 1 of 40 C.F.R. § 63.360, the procedures listed in 40 C.F.R. § 63.363, and the test methods listed in 40 C.F.R. § 63.365.

17. 40 C.F.R. § 63.363(a)(2) requires the owner or operator of all sources subject to the emission standards in 40 C.F.R. § 63.362 to complete performance testing within 180 days after the compliance date for the specific source as determined in 40 C.F.R. § 63.360(g).

18. 40 C.F.R. § 63.363(b) establishes the procedures that the owner or operator of a sterilization source shall use to determine initial compliance with the emission limits under 40 C.F.R. § 63.362(c), the sterilization chamber vent standard and to establish operating limits for the control devices.

19. 40 C.F.R. § 63.363(b)(3) provides that for facilities with catalytic oxidizers or thermal oxidizers, the operating limit consists of the recommended minimum oxidation temperature provided by the oxidation unit manufacturer for an operating limit.

20. 40 C.F.R. § 63.363(f) provides that a facility must demonstrate continuous compliance with each operating limit and work practice standard required, except during periods of startup, shutdown, and malfunction, according to the methods specified in 40 C.F.R. § 63.364.

21. 40 C.F.R. § 63.364(a)(1) provides that an owner or operator of a source subject to the emissions standards in 40 C.F.R. § 63.362 shall comply with the monitoring requirements in 40 C.F.R. § 63.8, according to the applicability in Table 1 of 40 C.F.R. § 63.360, and 40 C.F.R. § 63.364.

22. 40 C.F.R. § 63.364(a)(2) requires the owner or operator of an ethylene oxide sterilization facility subject to the emissions standards of NESHAP Subpart O to monitor the parameters specified in 40 C.F.R. § 63.364. All monitoring equipment shall be installed such that

representative measurements of emissions or process parameters from the source are obtained.

23. 40 C.F.R. § 63.364(c) provides that for sterilization facilities complying with 40 C.F.R. § 63.363(b) or (c) through the use of catalytic oxidation or thermal oxidation, the owner or operator shall either comply with 40 C.F.R. § 63.364(e) or continuously monitor and record the oxidation temperature at the outlet to the catalyst bed or at the exhaust point from the thermal combustion chamber using the temperature monitor described in 40 C.F.R. § 63.364(c)(4). Monitoring is required only when the oxidation unit is operated. From 15–minute or shorter period temperature values, a data acquisition system for the temperature monitor shall compute and record a daily average oxidation temperature. Strip chart data shall be converted to record a daily average oxidation temperature each day any instantaneous temperature recording falls below the minimum temperature.

24. 40 C.F.R. § 63.364(c)(4) provides that a facility shall install, calibrate, operate, and maintain a temperature monitor accurate to within ±5.6 °C (±10 °F) to measure the oxidation temperature. The owner or operator shall verify the accuracy of the temperature monitor twice each calendar year with a reference temperature monitor (traceable to National Institute of Standards and Technology ("NIST") standards or an independent temperature measurement device dedicated for this purpose). During accuracy checking, the probe of the reference device shall be at the same location as that of the temperature monitor being tested. As an alternative, the accuracy temperature monitor may be verified in a calibrated oven (traceable to NIST standards).

25. 40 C.F.R. § 63.365(a) provides that the owner or operator of a source subject to the emissions standards in 40 C.F.R. § 63.362 shall comply with the performance testing requirements in

40 C.F.R. § 63.7 of Subpart A of Part 63, according to the applicability in Table 1 of 40

C.F.R. § 63.360, and in 40 C.F.R. § 63.365.

<u>NESHAP General Provisions—Performance Testing Requirements</u>

26. 40 C.F.R. § 63.7(e)(1) provides, among other things, that performance tests shall be

conducted under such conditions as the Administrator specifies to the owner or operator

based on representative performance (i.e., performance based on normal operating

conditions) of the affected source.

27. 40 C.F.R. § 63.7(e)(3) provides, among other things, that unless otherwise specified in a

relevant standard or test method, each performance test shall consist of three separate runs

using the applicable test method. Each run shall be conducted for the time and under the

conditions specified in the relevant standard. For the purpose of determining compliance with

a relevant standard, the arithmetic mean of the results of the three runs shall apply.

## B. FINDINGS OF FACT

The following findings of fact are based on a review of Respondent's Facility records,

inspections of the Facility performed by EPA, and periodic meetings between Respondent and

EPA:

28. Respondent owns and operates the EtO Facility, located at Road 701 Km. 0.7 in the

municipality of Salinas, Puerto Rico ("Facility"), which uses EtO for sterilization and has

been in operation since 1986.

29. EPA Region 2 conducted an investigation of Respondent's Facility pursuant to Section 114

of the Act, 42 U.S.C. § 7414 ("EPA Investigation"). The EPA Investigation included, in part:

a) numerous on-site inspections of the Facility, from December 18, 2018, through the present time; b) information requests made to STI about the Facility and its operations; and c) a review of Respondent's records and data, as provided to EPA subsequent to the on-site inspections and in response to information requests.

30. The EPA Investigation indicates that the Facility consumes more than 10 tons per year of EtO. According to STI's EtO consumption logs from 2016-2022, the Facility consumes an average of approximately 35-40 tons per year of EtO.

31. From at least December 2009, STI operated a thermal oxidizer as its EtO control device under a minor source operating permit issued by DNER.

32. On December 18, 2018, EPA Region 2 conducted an on-site inspection of the Facility (the "December 2018 Inspection"). The report of the December 2018 Inspection was provided to Respondent on March 3, 2019, by electronic mail.

33. EPA Region 2, accompanied by inspectors from the EPA National Enforcement Investigation Center ("NEIC"), conducted an on-site inspection of the Facility on December 4, 2019 (the "December 2019 Inspection"). The report of the December 2019 Inspection was provided to Respondent on May 21, 2020, by electronic mail.

34. During the December 2019 Inspection, the EPA inspector and the NEIC inspectors conducted a walkthrough of the EtO Facility, reviewed and requested information to evaluate Respondent's compliance with NESHAP Subpart O, among other requirements, and had a discussion with STI's representatives about the potential non-compliance found as a result of the December 2018 Inspection.

35. Based on the observations made during the December 2018 Inspection and the December 2019 Inspection, and the evaluation of relevant Facility documents, EPA found and confirmed that, among other things, Respondent:

    a.    Did not operate the thermal oxidizer at a temperature greater than or equal to the established minimum baseline temperature of 1,521°F that was calculated during the 1999 Performance Test to achieve the required 99% destruction of EtO emissions from the sterilization chambers. This is based on the temperature charts provided by Respondent during EPA's December 2018 and December 2019 Inspections for EPA review, which revealed that thermal oxidizer was operated at temperatures that ranged between 700ºF to 900ºF; and

    b.    Did not have the proper instrumentation to record or calculate the daily average oxidation temperature of the thermal oxidizer. This is based on the information provided by Respondent during EPA December 2018 and December 2019 Inspections, which revealed that Respondent collect daily thermal oxidizer temperature recorder strip charts, but did not have the necessary instrumentation or procedure for the recording or calculation of the daily oxidation temperature.

36. On August 22, 2019, EPA issued to Respondent a Request for Information ("RFI") pursuant to Section 114(a) of the Act, which required Respondent to submit a performance testing protocol ("Test Protocol") for the existing thermal oxidizer control device by October 6, 2019, in accordance with 40 C.F.R. §§ 63.7 and 63.365, for EPA review and approval.

37. Respondent requested additional time to submit the Test Protocol, which EPA granted.

38. On April 28, 2021, the DNER issued to STI a renewal minor source operating permit, PFE-RG-63-0715-0810-I-II-III-O (the "April 2021 Operation Permit"). The April 2021 Operation Permit authorized operation of the thermal oxidizer as the EtO control device for the Facility, with an effective date of April 28, 2021, and an expiration date of April 28, 2026.

39. Respondent submitted a revised Test Protocol, for EPA review and approval. After several exchange of comments between Respondent and EPA, on June 15, 2021, EPA approved the Test Protocol.

40. On June 29, 2021, EPA issued a Notice of Violation ("NOV"), Docket No. CAA-02-2021-1303, citing violations of, among other things, the CAA, 42 U.S.C. 7401 et seq., and applicable requirements in NESHAP Subpart O.

41. On July 19, 2021, Respondent and EPA held a conference to discuss the violations alleged in the NOV. On August 11 and 12, 2021, Respondent conducted the performance test for the existing thermal oxidizer requested by EPA pursuant to Section 114(a) of the Act,

42. On October 12, 2021, Respondent submitted the test report ("Test Report") for EPA's review and approval.

43. On October 13, 2021, EPA provided comments on the Test Report to Respondent via email, identifying deficiencies in conducting the performance test, and requesting additional documentation related to the results presented in the Test Report.

44. On October 14, 2021, and October 28, 2021, Respondent submitted responses to EPA that partially addressed EPA's comments on and concerns with the performance test and an addendum to the Test Report.

45. On November 8, 2021, the DNER issued a modification to the April 2021 Operation Permit. The modification removed two boilers as alternate control devices for the aeration rooms. With this permit, the thermal oxidizer was the only authorized EtO control device for controlling EtO emissions from the sterilization chambers and aeration rooms.

46. On November 15, 2021, Respondent submitted to EPA a second addendum to the Test Report.

47. On April 7, 2022, upon review of the Test Report and supporting materials, EPA issued a letter to Respondent rejecting the Test Report based on various data quality deficiencies and deviations from the approved test protocol. Due to the deviations and deficiencies, the Test Report did not demonstrate that the operation of the thermal oxidizer ensured continuous compliance with the emission standards for the sterilization chambers and aeration rooms established by NESHAP Subpart O.

48. Since EPA's rejection of the Test Report in April 2022, Respondent has not conducted a performance test of the thermal oxidizer to demonstrate compliance with the emission standards for the sterilization chambers and aeration rooms established by NESHAP Subpart O.

49. On July 8, 2021, Respondent submitted to DNER an application requesting a modification to the construction permit, seeking authorization to construct a new aeration room #4 and to install a catalytic recuperative oxidizer ("CRO") as the new EtO control device for the sterilization rooms and aeration rooms.

50. On July 26, 2022, DNER issued to Respondent the construction permit authorizing the construction of aeration room #4 and the installation of the CRO as the EtO emission control device at the Facility.

51. On August 29, 2022, Respondent submitted an application to DNER to modify the April 2021 Operation Permit, seeking authorization to operate the CRO as the emission control device for the Facility.

52. On October 6, 2022, DNER issued a modified permit (the "October 2022 Operation Permit") authorizing STI to operate the CRO as the emission control device for the ETO Facility. The October 2022 Operation Permit supersedes all previous versions of the operation permit. The October 2022 Operation Permit expires on April 28, 2026.

53. The October 2022 Operation Permit requires Respondent to conduct a performance test for the CRO to demonstrate that it complies with a minimum removal efficiency of 99.9% for the EtO emissions from the sterilization chambers and the aeration rooms.

54. Since the issuance of the October 2022 Operation Permit, Respondent made several attempts to start-up the CRO. On three different occasions, (October 2022, January 2023, and March 2023) the CRO encountered operational issues that caused loud detonation incidents. During these incidents, the lower explosive limit ("LEL"), of the gases routed from the sterilization chamber to the CRO exceeded the value established by the CRO programming, triggering an automatic shutdown of the CRO.

55. To avoid these incidents, Respondent invested in a series of measures and automation projects, such as the installation of variable frequency drives ("VFD") and programmable logic controllers ("PLC") to all sterilization chambers vacuum pumps. The installation of these VFD's and PLCs allows Respondent to establish automated operational commands and communication between these components and the CRO to reduce the flow of gases from the sterilization chambers when an increment in LEL is detected. Also, Respondent installed computer screens at the sterilization area operator control room where the operators can

visually observe and monitor the operation of the CRO and monitor critical parameters such as the LEL values. Respondent also took measures such as reducing the LEL operational limit established by the GCES manufacturer from 25% to 8%, this programming guarantee that the conditions that triggered the detonation incidents are avoided and to ensure permanent operation of the CRO.

56. Respondent conducted a series of simulations which each sterilization chamber and under numerous operational scenarios to determine the CRO capability to react and operate accordingly. After completion of these simulations, Respondent conducted a series of test runs under different operational scenarios, these runs triggered the need of actions such as replacing LEL sensors and automation programming fine tuning.

57. On August 22, 2023, Respondent submitted for EPA's review a performance test protocol for conducting the required performance testing to establish the CRO operational parameters for demonstrating compliance with the NESHAP Subpart O and informed about their intention to conduct the performance test towards the end of October 2023. On September 15, 2023, Respondent confirmed to EPA that the performance test date was established for the week of November 6, 2023.

58. The CRO has been in continuous operation at the Facility since September 4, 2023.

59. As of the date of this Order, Respondent has not conducted a performance test of the CRO required by NESHAP Subpart O that shows that the CRO will operate in compliance with the EtO emissions standards.

## C. CONCLUSIONS OF LAW

Based on the Findings of Fact set forth above in Section C, EPA reaches the following Conclusions of Law:

60. Respondent is a "person" within the meaning of Section 302(e) of the Act, 42 U.S.C. § 7602(e), and the Puerto Rico RCAP Rule 102.

61. Respondent is the owner and operator of the Facility within the meaning of Section 112(a)(9) of the CAA, 42 U.S.C. § 7412(a)(9), and 40 C.F.R. § 63.2.

62. The Facility is subject to the applicable requirements in NESHAP Subpart O.

63. Respondent is in violation of 40 C.F.R. §§ 63.362(c), 63.363(a)(1), and 63.363(b)(3), and Section 112 of the Act, for failing to operate the thermal oxidizer at the required minimum baseline temperature to achieve 99% destruction of EtO emissions from the sterilization chambers.

64. Respondent violated 40 C.F.R. §§ 63.363(f) and 63.364(c), and Section 112 of the Act, for failing to convert strip chart data to record a daily average oxidation temperature each day any instantaneous temperature recording of the thermal oxidizer falls below the minimum baseline temperature.

65. Respondent failed to demonstrate that the existing thermal oxidizer is operated in compliance with the applicable 99% efficiency standard for reducing EtO emissions, in violation of 40 C.F.R. § 63.362 of NESHAP Subpart O.

66. Respondent failed to demonstrate that the CRO is operated in compliance with NESHAP Subpart O, to assure continuous compliance with the applicable 99% efficiency standard for sterilization chambers and aeration room emissions, in violation of 40 C.F.R. § 63.362.

## D. ORDER

Based upon the foregoing Findings of Fact and Conclusions of Law, and pursuant to Section 113(a) of the Act, 42 U.S.C. § 7413(a), EPA HAS DETERMINED AND HEREBY ORDERS that:

### I

The provisions of this Order shall apply to Respondent and to its officers, acting pursuant to, through or for the Respondent.

### II

Not later than twenty (21) days from the effective date of this Order, Respondent shall disconnect the thermal oxidizer from its fuel source line and from the sterilization chambers and aeration rooms.

### III

Not later than November 10, 2023, Respondent shall conduct a performance test of the CRO in accordance with 40 C.F.R. §§ 63.7 and 63.363, and with the August 17, 2023, EPA-approved site-specific test protocol.

### IV

Within 60 days of completing the performance test, STI shall submit the final test report to EPA and DNER for review and approval, pursuant to 40 C.F.R. § 63.7(g).

In accordance with 40 C.F.R. § 63.7(g), the results of the performance test shall be submitted as part of the notification of compliance status required under 40 C.F.R. § 63.9(h). The final test

report shall include the minimum oxidation temperature for the CRO to be continuously monitored and recorded to demonstrate compliance with NESHAP Subpart O, in accordance with 40 C.F.R. §§ 63.363(b)(3) and 63.364(c), and any other parameters, limits, work practices or monitoring necessary to ensure that the control device is operated and maintained in compliance with NESHAP Subpart O.

## V

No later than one-hundred and fifty (150) days from the Effective Date of this Order, Respondent must submit a written statement certifying compliance with this Order, the applicable NESHAP Subpart O standards and the Act.

## VI

All documents submitted by Respondent as part of this Order shall include the following certification, signed by a duly authorized officer of Respondent:

"I certify under penalty of law that I have examined and am familiar with the information submitted in this document and all attachments and that, based on my inquiry of those individuals immediately responsible for obtaining the information, I believe that the information is true, accurate, and complete. I am aware that there are significant penalties for submitting false information, including the possibility of fines and imprisonment."

### E. GENERAL PROVISIONS

67. Respondent shall provide EPA and its representatives, including contractors, with access to the Facility for the purpose of assessing Respondent's compliance with this Order, NESHAP

Subpart O, and the Act. Respondent shall also provide EPA and its representatives, including contractors, with access to all records relating to Respondent's implementation of this Order.

68. Respondent shall preserve all documents and information relating to the activities carried out pursuant to this Order and NESHAP Subpart O. Upon request, Respondent shall provide EPA with the originals or copies of such documents and information.

69. All documents, reports, and results required by this Order shall be submitted to:

Nancy Rodríguez, Chief

Multimedia Permits and Compliance Branch

Caribbean Environmental Protection Division

U.S. Environmental Protection Agency - Region 2

City View Plaza II – Suite 7000

#48 Road. 165 Km. 1.2

Guaynabo, Puerto Rico 00968-8073

rodriguez.nancy@epa.gov

Attn: Alex Rivera, Enforcement Officer

rivera.alex@epa.gov

70. Any failure to comply with the requirements of this Order shall constitute a violation of this Order and may result in a CAA administrative penalty order for up to $55,808 per day per violation, or a civil judicial action seeking an injunction and civil penalties of up to $117,468 per day per each violation, as provided in Sections 113(b)(2) and (113(d)(1) of the Act (as adjusted for inflation pursuant to 40 C.F.R. § 19.4) , as well as criminal sanctions as provided in Section 113(c) of the Act, 42 U.S.C. § 7413(c). This amount has been adjusted over time as required by the Federal Civil Penalties Inflation Adjustment Act of 1990 (28 U.S.C. § 2461 note; Pub. L. 101-410), as amended by the Debt Collection Improvement Act of 1996,

and most recently, by the Federal Civil Penalties Inflation Adjustment Act Improvements Act of 2015 (28 U.S.C. § 2461 note; Pub. L. 14-74, Section 701). The EPA may use any information submitted under this Order in an administrative, civil judicial, or criminal action.

71. Nothing in this Order shall relieve Respondent of the duty to comply with all applicable provisions of the Act or other federal, state or local laws, regulations, or statutes, nor shall it restrict the EPA's authority to seek compliance with any applicable laws or regulations, nor shall it be construed to be a ruling on, or determination of, any issue related to any federal, state, or local permit.

72. Nothing herein shall be construed to limit the power of the EPA to undertake any action against Respondent or any person in response to conditions that may present an imminent and substantial endangerment to the public health, welfare, or the environment.

73. The provisions of this Order shall apply to and be binding upon Respondent. From the Effective Date of this Order until the Termination Date as set forth below in paragraph 81, Respondent must give written notice and a copy of this Order to any successors in interest prior to any transfer of ownership or control of any portion of or interest in the Facility. Simultaneously with such notice, Respondent shall provide written notice of such transfer, assignment, or delegation to the EPA. In the event of any such transfer, assignment, or delegation, Respondent shall not be released from the obligations or liabilities of this Order unless the EPA has provided written approval of the release of said obligations or liabilities.

74. Unless this Order states otherwise, whenever, under the terms of this Order, written notice or other document is required to be given, it shall be directed to the individual specified at the address in Paragraph 69 of this Order unless that individual or his successor gives notice of a

change of address to the other party in writing. All notices and submissions shall be considered effective upon receipt.

75. To the extent this Order requires Respondent to submit any information to the EPA, Respondent may assert a business confidentiality claim covering part or all of that information, but only to the extent and only in the manner described in 40 C.F.R. Part 2, Subpart B. The EPA will disclose information submitted under a confidentiality claim only as provided in 40 C.F.R. Part 2, Subpart B. If Respondent does not assert a confidentiality claim, the EPA may make the submitted information available to the public without further notice to Respondent.

## F.  EFFECTIVE DATE AND OPPORTUNITY FOR A CONFERENCE

76.  Pursuant to Section 113(a)(4) of the Act, Respondent may request a conference with the EPA concerning the violation[s] alleged in this Order to present evidence bearing on the finding of violation, on the nature of the violation, and on any efforts it may have taken or it proposes to take to achieve compliance. Respondent may have legal counsel at the conference.

77. Respondent's request for a conference must be confirmed in writing within ten (10) days of receipt of this Order. If the requested conference is held, this Order shall become effective ten (10) days after the conference is held.

78. If Respondent does not request a meeting within ten (10) days of receipt of this Order, Respondent waives its right to a conference, and this Order shall become effective ten (10) days from its receipt.

79. Any request for a conference, or other inquiries concerning this Order, should be made in writing to:

Evelyn Rivera-Ocasio, Assistant Regional Counsel

Office of Regional Counsel

U.S. Environmental Protection Agency - Region 2

City View Plaza II – Suite 7000

#48 Road. 165 Km. 1.2

Guaynabo, Puerto Rico 00968-8073

rivera-ocasio.evelyn@epa.gov

## G. JUDICIAL REVIEW

80.   Respondent may seek federal judicial review of the Order pursuant to Section 307(b)(1) of the Clean Air Act, 42 U.S.C. § 7607(b)(1).

## H. TERMINATION

81. This Order shall terminate on the earlier of the following, at which point Respondent shall operate in compliance with the Act and all applicable regulations, rules and permits:

   a.  One-hundred and eighty (180) days from the from the Effective Date of this Order;

   b.  The effective date of any written determination by the EPA that Respondent has achieved compliance with all terms of this Order; or

   c.  Immediately upon receipt by Respondent of notice from the EPA finding that an imminent and substantial endangerment to public health, welfare, or the environment has occurred.

October 23, 2023

Date

CARMEN GUERRERO PEREZ

Digitally signed by CARMEN GUERRERO PEREZ
Date: 2023.10.23 15:12:25 -04'00'

Carmen R. Guerrero, Director

Caribbean Environmental Protection Division

To:    Jorge Andres Vivoni Ortiz
       Vice President and General Manager
       Steri-Tech Inc.
       avivoni@steri-tech.com

Cc:    Amarilys Rosario-Ortiz
       Manager, Air Quality Area
       Puerto Rico Department of Natural and Environmental Resources
       amarilysrosario@drna.pr.gov